IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WOODROW CROMER,

Plaintiff,

v.                                                    Civil Action No. 1:09-CV-117

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.      Background

Plaintiff, Woodrow Cromer (Claimant), filed a Complaint on August 13, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on October

22, 2009.[2]  Claimant filed her Motion for Summary Judgment on December 17, 2009.[3]

Commissioner filed his Motion for Summary Judgment on January 14, 2010.[4]

B.      The Pleadings

1.      Plaintiff's Brief in Support of Motion to Remand.

---

[1] Docket No. 3.

[2] Docket No. 7.

[3] Docket No. 11.

[4] Docket No. 16.

2.    Defendant's Brief in Support of Motion for Summary Judgment.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because 1) the ALJ properly followed the five-step sequential analysis, 2) the ALJ gave appropriate weight to the treating physicians' opinions, and 3) the ALJ did not err by not employing a VE to establish the limitations due to a non-exertional impairment.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on December 13, 2006, alleging disability since November 1, 2006, due to leg, shoulder, and low back pain. (Tr. 123).  The claim was denied initially on February 12, 2007, (Tr. 42) and upon reconsideration on April 18, 2007.  (Tr. 49).  Claimant filed a written request for a hearing on April 26, 2007.  (Tr. 55).  Claimant's request was granted and a hearing was held on January 7, 2009.  (Tr. 16-37).

The ALJ issued an unfavorable decision on February 4, 2009.  (Tr. 4-15).  The ALJ determined Claimant was not disabled under the Act because Claimant did not have an impairment or combination of impairments (20 C.F.R. 404.1521 and 416.921) that significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months.  (Tr. 11).  Claimant filed a request for review of that determination,

and the request for review was denied by the Appeals Council on June 20, 2009. (Tr. 1).

Therefore, on June 20, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this

Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on September 9, 1964, and was forty-two (42) years old as of the

onset date of his alleged disability and forty-four (44) as of the date of the ALJ's decision. (Tr.

101). Claimant was therefore considered a "younger person," under the age of 50 and, generally,

whose age will not seriously affect the ability to adjust to other work, under the Commissioner's

regulations at the time of her onset date and at the time of the ALJ's decision. 20 C.F.R. §§

404.1563(c), 416.963(c) (2009). Claimant graduated high school (Tr. 21) and has past relevant

work experience as a garbage man for 20 years and a janitor for six months. (Tr. 22).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence

supports the ALJ's determination that Claimant's subjective complaints were not entirely

credible:

**Medical Records, University of Virginia Medical Center, Diagnostic Division, Department of Radiology, 8/25/86 - 9/25/86 (Tr. 167-69)**
8/25/86
- illegible
9/23/86
- two fractures of left femur
9/25/86
- intramedullary rod placed on right, intramedullary rod and femoral rod placed on left

**Consultative Examination, Dr. Togliatti-Trickett, Independence Sports Medicine & Physical Therapy, 2/6/07 (Tr. 173-78)**
objective: pain in legs and low back; constant burning in knees; pain in hips, knees, low back,

and shoulders; numbness and tingling in arms and legs; can stand for only 20 minutes; can only walk 20 to 25 minutes

musculoskeletal exam: examination of posture revealed increase in lumbar lordosis and slight increase in thoracic kyphosis with mild forward head; bilateral scapular winging; range of motion of all four extremities was within functional limits; slight limitation of lumbar spine; no evidence of muscle atrophy proximally in shoulder girdle; no lower extremity edema; +2 dorsal pedal pulses bilaterally; no joint effusion, warmth or erythema

neurological exam: cranial nerves II-XII were intact; normal strength in all four extremities; gait was within normal limits; able to walk on heels, toes, squat, and arise without difficulty; intact strength surrounding bilateral shoulder musculature even though he had bilateral scapular winging; normal strength in bilateral serratus anterior muscles; negative straight leg lift and slump test bilaterally; negative Hoffman's bilateral upper extremities

impression: no significant limitations with range of motion or general strength; should be able to sit, stand, and walk without significant limitation. Should be able to lift without significant difficulty

**Medical Records, Dr. Kundranda, 3/12/07 (Tr. 199-201)**
- complaints: generalized body pains; pain in lower back, both shoulders, and thighs; burning in knees; pain gets sharp in lower back - mainly on left; pain in hips; no sensory loss; no trouble with bowel or bladder
- assessment/plan:
      lumbago: if no improvement with conservative measures, consider MRI and physical therapy; use ibuprofen
      joint pain-shoulder: tendinitis and rotator cuff injury bilaterally, possible bursitis; use ibuprofen; if no improvement, refer to ortho

**Medical Records, Dr. Browning, Northern Greenbrier Health Clinic, 7/15/08 - 10/22/08 (Tr. 181-91 & 198)**
7/15/08
- subjective: lots of back pain and left shoulder pain; requests x-rays
- objective: left shoulder
- assessment/plan: x-ray for left shoulder pain; x-ray for lumbar back pain
7/15/08
- AP views of left shoulder in internal and external rotation
- no evidence of fracture or dislocation; humeral head maintains proper position relative to glenoid; acromio-clavicular joint is intact; no soft tissue or tendon calcification noted
- impression: normal left shoulder
7/15/08
- AP, lateral, coned down sacral, and oblique views of lumbosacral spine
- normally preserved alignment; normal vertebral body heights and disk-space intervals; no evidence of spondylolysis or spondylolisthesis
- impression: normal lumbar spine films
7/23/08
- subjective: left shoulder pain; feels dizzy, off-balance when standing up; back pain

- objective: muscle spasms
- assessment/plan: left shoulder pain - MRI; dizziness - possible orthostatic observation
7/31/08
- subjective: increased shoulder pain in left shoulder; dizziness improving; left shoulder hurts to move up and down; heartburn
- objective: left shoulder pain - adbudction; point tenderness
assessment/plan: left shoulder pain - subacromial bursitis; GERD
8/19/08
- subjective: shoulder, leg, and lower back pain; shoulder pain improving; GERD improving
- objective: left spine spasms
- assessment/plan: generalized OA; GERD improving
9/18/08
- subjective: legs feel heavy when walking; bilateral leg pain; walking aggravates pain; burning in knees; shoulder pain improving with injection, but still has pain
- objective: left shoulder tenderness
- assessment/plan: left shoulder pain - MRI; leg pain - lipid labs; S/D; GERD - prilosec
10/9/08
- subjective: bilateral leg and back pain; pain is aggravated by standing and walking; takes tylenol for knee problems
- assessment/plan: multiple arthmalgias; elevated liver enzymes
10/22/08
- subjective: dizziness; feels nauseated; sneezing; pressure in head; not sleeping well
- assessment/plan: dizziness - medication; mild depression - no medical treatment at this point; chronic pain - unknown atiology

**MRI left shoulder, Dr. Hetzer, Davis Memorial Hospital, 9/30/08 (Tr. 192)**
- marrow signal appears normal; no definite rotator cuff tear seen; no joint effusion; no significant degenerative changes
- impression: no definite rotator cuff tear or acute abnormality

**Residual Functional Capacity, Dr. Browning, 12/17/08 (Tr. 202-07)**
- diagnosis: mild depression; GERD; chronic LBP; polymyalgia unknown etiology; polyanthralgia unknown etiology
- symptoms: low back pain; left shoulder pain; leg pain; hip and knee pain; intermittent dizziness
- clinical findings and objective signs: x-rays of joints WNL, left lower extremity, positive SLR; decreased patellar and achilles reflex on left; decreased muscle strength of toe #1
- expect impairments to last at least 12 months
- psychological conditions affecting physical condition: depression
- little objective evidence to support his symptoms
- capable of handling low stress
- able to sit for 15 minutes
- able to stand for 10 minutes
- able to sit, stand, and walk about 2 hours in an 8 hour workday
- would not need to lie down during the workday; however, would need a job permitting position

shifting throughout the day
- patient may carry:
     less than 10 lbs occasionally
     10 lbs occasionally
     20 lbs rarely
     50 lbs never
- patient may engage in the following activities:
     twist: occasionally
     stoop: never
     crouch: never
     climb ladders: never
     climb stairs: occasionally
- patient states he cannot read or write very well

D.    <u>Testimonial Evidence</u>

     Testimony was taken at the hearing held on January 7, 2009. The following portions of

the testimony are relevant to the disposition of the case:

ATTY     Thank you, Your Honor.  Your Honor, Mr. Cromer - - and as you know, we submitted his school records, and those are in the E exhibits rather than the F.  But he finished next to last in his class, if you'll take a look at that, 145th out of 146th, with CTPS scores of two to 4-percent.  And those are in 12E, and we submitted them.  Now one of the things that we haven't done - - and I take the blame for that because I haven't submitted to you a psychological report in this case.  And Dr. Browning's records and reports seem to indicate the need for that. But let's talk about Mr. Cromer a little bit, and then we'll put him on.  This is a man who has a basis for his  complaints of pain.  Albeit, he worked 20 some odd years despite all of this.  But he was in University of Virginia Medical Center for a period in 1986, 8/25 through 9/23/86, Exhibit 1F.  And he's still suffering from that.  He has problems with both his legs that are the most extreme issues he has.  And he worked hard work.  This man worked 20 years as a garbage man. And he worked in Ohio.  And it was heavy, heavy work that he did.  He just could not longer do that, is why he's here.  He just - - he threw garbage.  He hurt, he suffered.  He really couldn't stand on his feet anymore and work in that manner.  And so he left that job, after many, many years, and in June of '08, he came back here.  And he started his application for disability in Ohio before he left.  But he tried to go back doing other work after that.  He tried to work cleaning a bank.  He was laid off.  He did that about six months.  And then he just couldn't be on his feet long enough to do everything - - anything.  He's trying to investigate, through Dr. Browning, what is wrong and why it's bothering him.  But his knees burn.  He has problems with his shoulders as well.  But the disabling issue is the sequelae  of the fractured femurs.  Is that a fair statement, Mr. Comer?
     CLMT     Yes.  It is.

       *     *     *

EXAMINATION BY ATTORNEY:

Q       You are Mr. Cromer.

A       Right.

Q       And how old are you?

A       I'm 44.

Q       And tell the Judge why you're here today.

A       Your Honor, I'm here today because I can't do the hard work no more.  I suffered for a long time doing it.  And I done it to put my kids through school.  And I can't do it no more.  I can't do it.  My legs hurt me too bad.  There was days I couldn't walk.  You know, I'd get out of bed, I couldn't walk, they hurt me so bad.

Q       This is while you were working.

A       I was working.

Q       And you just - - how did you do it?

A       It was hard.  I had a friend to help me to get to work.  And then when I got to work, I would hide it from work, because I didn't want them to know.  You know, I was afraid they'd fire me or, you know, get me gone in some way.  I hid it from work for a long time, you know, about my situation, you know.  And I done it for a long time.  And it just got to where I couldn't do it no more.

Q       So tell the Judge what's bothering you.

A       My legs.  They hurt me.  My knees burn me.  When I lay down at night I can't sleep, because they burn me bad.  And my back my back hurts me, my lower back, it hurts me.  My hips, they hurt me too.

Q       You have a cane with you.

A       Right.

                        *               *               *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q       Now you have a cane.  Do you use that in your right hand?

A       Yes.

Q       You're right hand dominant.  Is that your - - are you right-handed?

A       Yeah.  I'm right-handed.

Q       How long have you used the cane?

A       Probably for a little over a year.

Q       And how did you get the cane?

A       How did I get the cane?

Q       Yes.

A       I bought it.

Q       Okay.  It wasn't prescribed for you.

A       No.

Q       It's something you just discovered was good - -

A       Yes.

BY ATTORNEY:

Q       Explain to him how it helps you.

A       It takes the weight off my hips and my lower back.  That's how it helps me.

Q       Have you fallen?

7

A       No.  I've never fell - fallen.

Q       Do you lose balance without the cane?

A       Yeah.  I do lose balance sometimes.

Q       What does your pain feel like?

A       It's an aggravating pain.  It's  - -

Q       Is it with you all the time?

A       95-percent of the time it is.

Q       Is it worse some times than others?

A       Yes.

Q       What aggravates it?

A       When I'm on my feet a lot, it aggravates it.  And when I worked, I suffered when I worked.

Q       Does weather bother it?

A       Cold weather bothers me too.

Q       Is it worse today?

A       Yes, because I rode a long ways today.

Q       Is it hard to ride?

A       Yes.  Sure is.

Q       What is it like sitting in a car the distance you had to come?

A       My left leg goes to sleep on me.  It kind of goes numb when I ride, you know, a long ways.

Q       Are you the type of guy who doesn't like going to doctors?

A       I can't stand going to the doctors.

ATTY       Is that why you didn't start treatment until you got to West Virginia?

ALJ       Why don't you - - instead of leading him, ask him why he didn't.

BY ATTORNEY:

Q       Okay.  Why didn't you?

A       Well, for one thing, I went to - - when I left work I'd - - work paid my insurance for like two months.  And then I didn't have insurance.  I didn't, you know, that signing up for Social Security would be so hard, you know, because of my record, my back record, you know, with what happened to me.  But I'm finding out now you've got to have a doctor, you know, doctor records, you know, showing you're going to the doctor.  I didn't know it at the time, you know.  And I worked all the time.  I never missed work.  Your Honor, I worked - -

ALJ       If you were having the problems that you had - - that you say you had while you were working, and you had insurance then, why didn't you go to the doctor then?

CLMT       I didn't think a doctor could help me.

ALJ       How did you know if you didn't go?

CLMT       I didn't know.  But they told me in Charlottesville I'd always have pain,

BY ATTORNEY:

Q       Do you take care of you needs, or do you have trouble?

A       What do you mean?

Q       I mean just daily activities.  Do you have trouble getting - - doing what you need to during the day?

A       I don't do a whole lot.

| | |
|---|---|
| Q | Okay.  So you limit your activities. |
| A | Yes. |
| Q | What is your day like? |
| A | Well, I try to walk some.  I don't walk too far. |
| Q | How far can you walk? |
| A | Maybe twice as far as the road. |
| ALJ | I didn't catch that.  How far? |
| ATTY | To the - - twice, back and forth from here to the road. |
| ALJ | Which I have no idea.  Do you want to ask him - - |
| ATTY | It's on 219.  I would say it's probably, what, 50 yards out to the road. |
| ALJ | Is that correct, Mr. Cromer, about 50 yards? |
| CLMT | Yeah.  I'd say so, yeah. |

BY ATTORNEY:

| | |
|---|---|
| Q | How is your attitude right now? |
| A | I don't have a very good attitude right now. |
| Q | Dr. Browning says you're depressed.  Are you unhappy? |
| A | Yeah.  I'm unhappy. |
| Q | Are you sad? |
| A | Somewhat, yeah. |
| Q | What's your moods like? |
| A | I don't care to be around people. |
| Q | Did you used to like being around people? |
| A | It didn't bother me as bad as it does now. |
| Q | So it's gotten worse. |
| A | Yes. |
| Q | Do you see anybody anymore? |
| A | I see my aunt and uncle, and my friend Billy. |
| Q | That's it? |
| A | And my Mom.   That's it. |
| Q | Okay.  How is your concentration? |
| A | Not good. |
| Q | Are you able to remember what's on a television program when you hear it and see it? |
| A | Some, not all.  I forget some. |
| Q | Do you lose the ability to remember?  Does it go away from you or something? |
| A | Sometimes I forget stuff. |
| Q | How about pressure?  Do you feel pressured? |
| A | I felt pressured this morning getting here, finding my way. |
| Q | Do you get worried? |
| A | Yes.  Because I don't want to be late. |
| Q | How about confusion? |
| A | Sometimes. |
| Q | Are you always thinking about your pain? |
| A | Yeah.  It's always there. |

Q    How long can you sit without problems?
A    I don't know.  Maybe 20 minutes.
                    *                    *                    *
Q    Okay.  Do you go grocery shopping?
A    No.  I don't.
                    *                    *                    *
Q    Do you have trouble in school?
A    Yes.
Q    What kind of trouble did you have?
A    I never could write very good or read, and math.
Q    Did you take any special education classes?
A    Yes.  I did.
Q    What did you have special education in?
A    Math, reading, and English, and - -
Q    Okay.  Do you have issues with your hands or arms at all?
A    When I'd throw garbage, my hands used to draw up on me.
Q    Are they doing better since you're not doing that?
A    They don't draw up no more.
Q    Okay.  So the physical work bothered you.
A    Yep.
Q    Now what did you do for fun that you can't do any longer?
A    I used to like to bow hunt a lot, deer hunt, bow hunt.
Q    You liked being out in the woods.
A    I love being in the woods.
Q    Are you able to do that?
A    No.
Q    Do you have trouble with your vision?
A    Yeah.  I can't see very good at night, and when it's raining outside, I can't see.
Q    Mr. Cromer, you're now treating with Dr.  Patricia Browning.  Is that correct?
A    Correct.
Q    Do you - - and you've been treating with her since July.  Is that right?
A    Correct.  Yeah.
Q    You did, at one point, go to the Cleveland Clinic.  Didn't you?
A    Yes.  I did.
Q    And was that before or after you quit work?
A    It was after I quit work, when I still had insurance.
Q    Were you able to get any help there?
A    She give me some pain pills that made me sick.
Q    And that was it?
A    Yeah.
                    *                    *                    *
BY ATTORNEY:
Q    Just that he - - that they gave you the meds that didn't help.  Is that right?
A    Right.  And I asked her to x-ray me, and she never would do it.

                              10

| Q | So she didn't take an x-ray. |
|---|---|
| A | Correct.  I asked her to, but she didn't do it. |
| Q | Okay.  I don't have anything further to tell the Judge.  I've told him what the records are in the cases.  Do you have anything you want to tell him? |
| A | Can I talk? |
| Q | Please, yes.  I asked - - |
| A | Your Honor, the reason I - - you know, I just never did go to the doctor when I worked because I didn't figure a doctor could do anything to help me.  And I worked - - when I worked at BFI up there, I worked long hours, you know, from daylight to dark.  But, you know, I put my years in there.  I suffered.  And that's the honest truth, I'm telling you. |
| ALJ | Okay. |

*                    *                    *

| ALJ | Anything else, counsel? |
|---|---|
| ATTY | No, Your Honor. |
| ALJ | All right.  I'm not going to take any testimony from Dr. Wells-Brown.  The  RFC from Dr. Browning, if I accept it as an accurate assessment of his functional capacity, clearly indicates that he is incapable of doing competitive employment as it asses a less than sedentary capacity.  It does not allow for an eight-hour workday, 40-hour week.  Such a person cannot do competitive employment.  I don't need an expert to tell me that.  If there's nothing further we will close today's hearing, unless you have some other comments, Mr. Foreman. |
| ATTY | No, sir.  I thank you for your courtesy.  And I'll see you in a few minutes. |
| CLMT | Thank you, Your Honor. |

*                    *                    *

E.        Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

- uses a cane (Tr. 25)
- takes small walks daily (Tr. 28)
- limits daily activities (Tr. 28)
- does not like to be around people (Tr. 29)
- has trouble concentrating (Tr. 29)
- has some trouble remembering things (Tr. 30)
- can only sit for 20 minutes without having problems (Tr. 30)
- does not grocery shop (Tr. 30)
- can no longer hunt (Tr. 31)
- has trouble seeing at night (Tr. 31)
- is able to read (Tr. 129)
- is able to drive but has trouble driving at night and in the rain (Tr. 129)

- has trouble using the stairs (Tr. 129)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant argues that the ALJ erred in his decision to deny Claimant DBI and SSI because the ALJ failed to follow the five-step sequential analysis, the ALJ improperly weighed the medical evidence of record, and the ALJ failed to use a vocational expert (VE) to establish non-exertional limitations.

Commissioner contends that the ALJ's decision is supported by substantial evidence because Claimant did not have a severe impairment, the ALJ properly followed the sequential evaluation process, the ALJ properly weighed the medical opinion evidence, and the ALJ was not required to use a VE.

B.    <u>Discussion</u>

I.    Whether the ALJ Followed the Five-Step Sequential Analysis.

Claimant argues that the ALJ used a two-step process to determine whether Claimant was entitled to disability benefits.  Specifically, Claimant argues that the ALJ employed an "all-or-nothing" approach when stating "after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the findings that the claimant has no severe impairments or combination of impairments for the reasons can be explained below."  (Pet. Br; Dkt. No. 12; P. 3).

Commissioner first contends that Claimant erroneously suggests that the ALJ was required to continue the sequential analysis even though the ALJ found no severe impairment.

Second, Commissioner contends that Claimant mischaracterized the ALJ's credibility analysis as a substitute for the five-step sequential analysis.

To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

At the second step in the sequential analysis, the ALJ considers the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled." Id. If the claimant does not have an impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities, the claimant is found not to have a severe impairment and is not disabled. § 404.1520(c).

At step two of the sequential analysis, the ALJ found Claimant not to have "an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months

. . . ." (Tr. 11). Therefore, and in accordance with § 404.1520, the ALJ found Claimant not to have a severe impairment and did not have to engage further in the analysis. Not only did the ALJ not err in his analysis, but also, the ALJ did not use an improper test. At step two of the sequential analysis, the ALJ can consider the claimant's subjective complaints of pain to determine if the claimant has a severe impairment. The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996). Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. <u>Id.</u> at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." <u>Id.</u> at 596.

What Claimant argues is an improper two-step sequential disability evaluation is actually the ALJ's <u>Craig v. Chater</u> analysis. In accordance with the <u>Craig v. Chater</u> credibility analysis, the ALJ states "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not *credible* to the extent they are inconsistent with finding that the claimant has no severe impairment or combination of impairments . . . ." (Tr. 12-13) (emphasis added). Accordingly, the ALJ did not err in applying the five-step sequential analysis.

II.     Whether the ALJ Properly Weighed the Medical Evidence.

Claimant argues that the ALJ did not use the same "critical eye" in evaluating all of the medical evidence. Commissioner contends that the ALJ followed the controlling regulations in evaluating the treating physician evidence and reasonably afforded little weight to Claimant's

primary care physician, Dr. Browning.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295,

297 n.1 (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). Claimant argues that the ALJ failed to examine all medical evidence with "a critical eye." It appears that Claimant argues the ALJ inappropriately rejected the opinion of Dr. Browning and ignored other objective medical evidence. The Court cannot say that the ALJ failed to give appropriate weight to Dr. Browning.

Dr. Browning opined that Claimant is disabled. However, and as the ALJ recognized, this was an issue reserved for the Commissioner. Therefore, the ALJ was not bound by Dr. Browning's determination. The ALJ did have a duty to consider the medical evidence that led to Dr. Browning's opinion. The ALJ did so and properly rejected the evidence. First, the ALJ found that Dr. Browning's opinion, based on her own treatment records, was actually inconsistent with her treatment records. (Tr. 14). The ALJ found that the "records include observations that the claimant engages in activities that are wholly inconsistent with the degree of limitation expressed in the doctor's opinion." (Id.) Additionally, the ALJ found that Dr.

Browning completed the Residual Functional Capacity Assessment "by adopting the claimant's complaints of pain and report of functional limitations." (Id.) However, the ALJ previously found Claimant's subjective complaints to be unreliable. (Tr. 12-13). Additionally, the ALJ again finds that the subjective complaints are inconsistent with the objective medical evidence, stating that the "limitations are excessive for such mild diagnoses of chronic low back pain of unknown etiology, polymyalgia of unknown etiology and polyarthralgia of unknown etiology, unsupported by objective laboratory studies." (Tr. 14). Therefore, the ALJ followed the regulations in rejecting the opinion of Dr. Browning.

Claimant also seems to argue that the ALJ picked and chose what on what parts of Dr. Togliatti-Trickett's medical records to rely. Specifically, Claimant argues that "when looking at the consultative examination heavily relied on by the presiding administrative law judge to deny benefits, found Exhibit 3F (Tr. 173-178) the presiding administrative law judge does not deal with pages 173-174. In that report, while it is true the consultative examiner finds 'minimal effect', [sic] the presiding administrative law judge does not deal with the ten percent across the board reduction in range of motion in the dorsal spine found at transcript page 177." (Pet. Br; Dkt. No. 12; P. 3).

Again, the Court cannot say that the ALJ improperly evaluated the medical evidence when relying on the opinion of Dr. Togliatti-Trickett. The ALJ found that this opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." (Tr. 14). According to the ALJ, Dr. Togliatti-Trickett "examined the claimant and provided specific reasons for the opinion about the claimant's residual functional capacity showing that it was grounded in the evidence in

the case record, including careful consideration of the claimant's allegations about her symptoms and limitations." (Id.).

Further, the ALJ evaluated the treatment records of Dr. Togliatti-Trickett. Specifically, the ALJ notes that "[r]ange of motion in all four extremities was within functional limits; he had slight limitation of lumbar spine . . . ." (Tr. 9). Therefore, although Claimant argues to the contrary, the ALJ did consider Claimant's "ten percent across the board reduction in range of motion in the dorsal spine." (Pet. Br; Dkt. No. 12; P. 3). Claimant cites no authority to suggest that this consideration by the ALJ fell short of any regulation.

Accordingly, the ALJ properly weighed the medical evidence. There is no error.

III.     Whether the ALJ Erred by not Using a Vocational Expert to Establish Limitations due to a Non-Exertional Impairment.

Claimant argues that the ALJ erred by not using a VE to establish the limitations due to a non-exertional impairment. Specifically, Claimant argues that Claimant suffers from depression, and the consultative exam used by the ALJ dealt only with physical exertional limitations and did not address Claimant's depression. Because Claimant alleged depression and the depression was not addressed in the consultative exams, Claimant argues that the ALJ had a duty to employ a VE to establish the limitations. Commissioner contends that Claimant's depression was not an impairment that significantly limited his ability to work.

In making his claim that the ALJ had a duty to employ a VE, Claimant relies on Smith v. Schweiker, 719 F.2d 723 (4th Cir. 1984). Claimant's interpretation of Smith is flawed. In Smith, the Fourth Circuit held that substantial evidence supported the ALJ's finding that the claimant's neurosis did not affect his capacity to perform sedentary work, and it was not improper to apply the grids in determining the claimant's disability status. Smith, 719 F.2d, at 725. Like Claimant,

the claimant in <u>Smith</u> argued that because he suffered from "'nonexertional impairments' in combination with his exertional impairments, the grid regulations cannot be controlling, but instead the Secretary must prove by specific vocational evidence that [the claimant] can perform jobs in the national economy." <u>Id</u>. The Court disagreed with the claimant that <u>Grant v. Schweiker</u> 699 F.2d 189 (4th Cir. 1983) controlled. The Court explained that "[a]lthough <u>Grant</u> makes clear that reliance on the grids is precluded where the claimant suffers from a 'nonexertional impairment,' not every malady of a 'nonexertional' nature rises to the level of a 'nonexertional impairment.' The proper inquiry, under <u>Grant</u>, is whether a given nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." <u>Id</u>. Whether a nonexertional condition affects a claimant's RFC is a question of fact. <u>Id</u>. Therefore, under <u>Smith</u>, the ALJ is not required to employ a VE unless the ALJ first finds the claimant's nonexertional impairment affects the claimant's RFC to perform a certain job.

The Court cannot say that the ALJ erred by not employing a VE to determine how much Claimant's nonexertional limitations affects his RFC because substantial evidence supports the ALJ's decision that Claimant's mild depression was not a nonexertional impairment. First, in October 2008, Dr. Browning diagnosed Claimant with mild depression but chose not to medically treat at that point. (Tr. 10). Second, in December 2008, Dr. Browning completed a RFC assessment in which she reported treating Claimant since July 2008 for diagnoses including mild depression. (Tr. 10-11). Included in her assessment was that "she was not sure if emotional factors contribute to the severity of the claimant's symptoms and functional limitations . . . ." (Tr. 11).

Whether Claimant's depression amounted to a nonexertional limitation was a question of fact for the ALJ.  The ALJ's decision that the depression was not a nonexertional limitation is supported by substantial evidence; therefore, the ALJ did not err by failing to employ a VE to determine Claimant's limitations based on depression.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because 1) the ALJ properly followed the five-step sequential analysis, 2) the ALJ gave appropriate weight to the treating physicians' opinions, and 3) the ALJ did not err by not employing a VE to establish the limitations due to a non-exertional impairment.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.


Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: January 21, 2010

/s/ *James E. Seibert*
JAMES E. SEIBERT

20

UNITED STATES MAGISTRATE JUDGE